STATE TRUST CO. v. KANSAS CITY, P. & G. R. CO. et al. (BREUEL et al., Interveners).

(Circuit Court, W. D. Missouri, W. D. February 7, 1903.)

No. 2,331.

1. RAILROADS—FORECLOSURE OF MORTGAGES—INTERVENTION.
   General creditors of a railroad company, who permit all its property to be taken possession of by receivers appointed in a foreclosure suit, and a decree to be entered subjecting such property to the payment of preferential debts, receivers' liabilities, and the mortgage indebtedness, and the property to be sold under the decree, and the sale confirmed, without taking any steps to assert their claims, although they matured prior to the commencement of the foreclosure suit, are precluded by laches from thereafter maintaining petitions of intervention to compel payment of their demands from the fund in the hands of the receivers on the ground that such receivers took into their possession property which was not subject to the lien of the mortgage.

2. SAME—MORTGAGE INCLUDING PERSONALTY—EFFECT OF FAILURE TO RECORD AS CHATTEL MORTGAGE.
   Where, as under the Kansas statute, as construed by its courts, an unrecorded chattel mortgage is valid as between the parties, and, if delivery to the mortgagee takes place at any time before a levy or sei-

zure is made in behalf of those persons as to whom it is void, the defect will be cured, and the mortgagee's lien will be protected, notwithstanding his failure to record, or to file the annual affidavit required, a mortgage covering all the property of a railroad company, real and personal, although not recorded as a chattel mortgage, is valid, as against general creditors of the mortgagor, as to personal property which was taken possession of and sold by receivers in a suit to foreclose, and passed into the possession of the purchaser before suit brought by such creditors.

**3. SAME—RIGHTS OF GENERAL CREDITORS—LACHES.**

General creditors of an insolvent railroad company, whose demands are unliquidated, and who take no steps to enforce payment until after all the property and funds of the company subject to their claims have been disbursed through a receivership in payment of other liabilities, have no equity to require payment from the proceeds of mortgaged property on the ground that the receivers took possession of money in the treasury of the company, and received the net income from the property.

**4. SAME—RIGHT OF FORECLOSURE.**

The fact that by the terms of a railroad mortgage the trustees therein are not authorized to enter and take possession of the property until six months after a default does not preclude a court of equity from entertaining a bill of foreclosure before that time, and appointing receivers, when it is found necessary for the protection of the mortgaged property, and to insure the due performance of the obligations which the mortgagor owed to the public.

**5. SAME—RIGHT OF INTERVENTION—IMPEACHMENT OF DECREE.**

After a court of equity has entered a decree foreclosing a railroad mortgage, and has sold the property free from all demands against the mortgagor, except an obligation on the part of the purchaser to see that the costs of suit, the receivers' liabilities, and preferential claims which may be allowed are paid, if not discharged by the proceeds of sale, it will not entertain petitions of intervention by unsecured creditors of the mortgagor, whose claims are not preferential, to compel the purchaser to pay the same on the ground that it is, in effect, a reorganization of the old company, and liable for its debts. Such a proceeding seeks to impeach the validity of the decree and sale, which cannot be done by an intervener, but only by an original suit.

In Equity.

Stephen H. Allen and Otis S. Allen, for interveners.
Lathrop, Morrow, Fox & Moore, for respondents.

THAYER, Circuit Judge.   The questions to be determined in this case arise in the following manner: . After a decree of foreclosure and sale had been entered in the above-entitled cause, and in pursuance thereof all the property of the Kansas City, Pittsburg & Gulf Railroad Company had been sold, which sale took place in March, 1900 (the bill of foreclosure having been filed on April 28, 1899, and receivers appointed at that time), John Breuel and others filed petitions of intervention in the above-entitled cause; claiming the right to do so under certain provisions of the decree of foreclosure.  These intervening petitions were referred to the special master theretofore appointed in the cause for hearing and a report thereon.  The Kansas City Southern Railway Company, the purchaser at the foreclosure sale, filed a demurrer to the several intervening petitions before the master, and, after a hearing had thereon, the master reported that the demurrers should be sustained.  Excep-

tions were taken to such report, and the question now before the court is whether the action of the master should be approved.

The various intervening complaints, which were identical in form, stated, in substance, that when the Kansas City, Pittsburg & Gulf Railroad Company constructed its railroad across the valley of a creek in Bates county, Mo., near the eastern boundary line of the state of Kansas, it erected an embankment across the valley, thereby obstructing the natural flow of the waters in said creek, and caused them to overflow the petitioners' lands, situated in the state of Kansas. The petitioners alleged that as a result of said overflow their crops had been damaged to a certain extent during the years 1896, 1897, and 1898; the embankment, as it seems, having been erected as early as the year 1894. For the amount of the damages so sustained they claimed an allowance against any funds then or thereafter in the hands of the receivers, derived from any source, and that, in case there were no funds in the hands of the receivers, the property which had been sold at the foreclosure sale, and was then in the hands of the Kansas City Southern Railway Company, be charged with a lien for the damages which the interveners had severally sustained, and that, unless these damages were paid, the property be retaken and sold to liquidate their several demands. This relief was prayed for on two principal grounds: In the first place, it was claimed that the receivers, when appointed, in April, 1899, had taken possession of certain personal property of the Kansas City, Pittsburg & Gulf Railroad Company, the mortgagor, which was located at Ft. Scott, Kan., and consisted of materials and supplies for the operation of a railroad—the same being of large value—which personal property, although described in the mortgage that had been foreclosed, yet, by virtue of the fact that the property was not delivered to the mortgagee, and by virtue of the fact that the provisions of Kansas laws relating to the recording of chattel mortgages had not been fully complied with, was not, as the interveners claimed, subject to the lien of the mortgage, so far as general creditors of the mortgagor were concerned. It was also alleged by the petitioners that no default had occurred under the mortgage when the receivers were appointed, such as authorized the trustees in the mortgage to take possession of the mortgaged property, and that the money on hand at that time, in the treasury of the mortgagor company, which came to the possession of the receivers, as well as the income which was derived by the receivers from the operation of the mortgaged property up to October 1, 1899, was not subject to the lien of the mortgage, but was subject to the claims of general creditors. The interveners insisted that their claims should be paid out of the two funds last described, because, as respects them, they were not subject to the lien of the mortgage. In the second place, the interveners allege that the stockholders and bondholders of the Kansas City, Pittsburg & Gulf Railroad Company, prior to the foreclosure sale, placed their stock and bonds in the hands of a reorganization committee upon the understanding and agreement with said committee, which was subsequently carried into effect, that a new company should be formed to purchase the property of the mortgagor com-

pany at the foreclosure sale, and that this new company, when it was formed and had made the purchase, should issue its bonds and common and preferred stock, in certain proportions, in lieu of the bonds and stock of the Kansas City, Pittsburg & Gulf Railroad Company that had been deposited with the reorganization committee. On account of this alleged arrangement, which was made in expectation of a sale under the decree of foreclosure, it is claimed, in substance, that the new company, namely, the Kansas City Southern Railway Company, which purchased at the foreclosure sale, is the successor of the mortgagor company, or, in other words, is the same company under a new name, and that it is liable for the mortgagor's debts, including the claims of the interveners.

Counsel for the interveners concede that the claims which they present were filed pursuant to paragraph 19 of the final decree, which ordered the special master to give a notice "requiring the holders of any claims against the Kansas City, Pittsburg & Gulf Railroad Company, or the receivers thereof, to present the same to him for allowance * * * within the period of six months after the first publication of such notice." The object of this provision of the decree was to require the holders of what are known as "preferential demands" and demands contracted by the receivers, to be presented for allowance within the period named, to the end that the aggregate amount of the debts which were entitled to payment in advance of the mortgage debt might be ascertained, and paid out of the fund realized at the mortgage sale before the fund was distributed among bondholders. The provision in question had reference solely to "preferential demands" and debts created by the receivers, as is clearly disclosed by the notice subsequently published by the master, the form of which notice was submitted to the court, and by it approved, before it was published. The notice in question called for the presentation of claims or demands against the receivers and against the property of the Kansas City, Pittsburg & Gulf Railroad Company, which had been theretofore sold pursuant to the decree of foreclosure, "which claims or demands are alleged to be of a preferential character, and to be such as the purchaser at the foreclosure sale is required to pay under and by virtue of the provisions of the decree of foreclosure." This notice, and the paragraph of the decree in conformity with which it was drawn, required parties to file such claims only, existing against the mortgagor company, as were entitled to payment out of the proceeds of the foreclosure sale before any distribution was made among bondholders; the object being to ascertain the net amount applicable to the payment of the mortgage debt. The provision of the decree that claims not thus presented should not be enforceable against the receivers, or against the property which had been sold, only operated to bar preferential demands and demands contracted by the receivers. It was not intended to bar the rights of creditors holding claims of a different character, nor did it have that effect. That paragraph 19 of the decree was inserted for no other purpose than the one last indicated, and had reference to preferential demands and those contracted by the receivers, is further shown by paragraph 15 of the decree and by paragraph 6 of the

order appointing receivers. Paragraph 15 of the decree only required the purchaser at the foreclosure sale to take the property subject to the payment of costs, debts contracted by the receivers, and such indebtedness of the mortgagor as was paramount in lien to the mortgage bonds, if it so happened that these claims were not paid out of the proceeds of the sale; the intent being to pass the property to the purchaser free from all other claims; and, by paragraph 6 of the order appointing receivers, they were given authority to pay, out of any income or revenue coming to their hands, such claims only as, according to all the authorities, are deemed to be of a preferential nature. The record discloses the fact that the foreclosure suit was administered throughout upon the theory that the court would only undertake to adjudicate and direct the payment of claims presented by interveners which were of a preferential character, and that it would not undertake to audit claims against the mortgagor that were not secured by any lien, legal or equitable, upon the property in the hands of its receivers.

Now, the claims involved in the present controversy are claims for unliquidated damages against the Kansas City, Pittsburg & Gulf Railroad Company. They have never as yet been reduced to a judgment in any court. Some of them accrued three years prior to the filing of the bill of foreclosure, and all of them had accrued before the bill was filed. It is obvious, therefore, that they are not preferential demands, in the sense in which that term is used in the decree, but are merely general claims against the mortgagor company, and are not supported by any lien, legal or equitable, against any of its property. Trust Co. v. Riley, 16 C. C. A. 610, 70 Fed. 32, 30 L. R. A. 456; Bank v. Doud, 44 C. C. A. 389, 105 Fed. 123, 52 L. R. A. 481. In view of these facts, the master was invested with no authority to hear and adjudicate these claims by virtue of paragraph 19 of the decree, and the notice issued in conformity therewith; and while it is true that some of the intervening petitions were referred generally to the master for hearing and report, by an order made on June 5, 1900, yet this order must be understood as having been made under and subject to the specific powers that had been conferred upon the master by the decree. It was entirely proper, therefore, for the master to decline to enter upon a hearing with respect to the merits of these unliquidated demands against the Kansas City, Pittsburg & Gulf Railroad Company, when it became apparent that they were in no sense claims of a preferential character or demands contracted by the receivers, and when it further appeared that their allowance and payment was pressed on the ground that some property had come to the possession of the receivers, to which the lien of mortgage possibly did not extend, and when it further appeared that, whether the mortgage lien did or did not extend to such property, the court, by its final decree, had in fact adjudicated that the mortgage did cover such property, and had directed its sale for the satisfaction of the mortgage indebtedness.

It is urged, however, in behalf of the interveners, that it is competent for the court to grant the relief now prayed for, even if it be true that the master properly rejected the interventions when he discovered that they were not founded upon preferential demands or debts contracted

by the receivers.   It is said, in substance, that as the court assumed control of all the property of the mortgagor company, including some to which the lien of the mortgage did not extend, thereby putting it beyond the reach of unsecured creditors, it is, in equity, bound to protect creditors of the latter class to the extent of ascertaining the validity of their claims, and the amount thereof, and requiring their payment to the extent of the value of such property of the mortgagor as was sequestrated in the foreclosure proceedings, to which the lien of the mortgage did not extend.   It is undoubtedly true that, when a court takes possession of property through the agency of a receiver, it is bound to protect the rights of any third party who has an interest in or a lien upon the property, and to entertain intervening petitions which may be filed to protect such an interest or to enforce such a lien, since it will not suffer the possession of its receiver to be disturbed by process emanating from any other court.   But in the case in hand the interveners had no specific interest in or lien upon any of the property which came to the possession of the receivers, as the interveners were merely general creditors of the mortgagor, and, as such, had no lien upon its property.   It was their privilege, doubtless, to have intervened in the foreclosure proceedings, and to have suggested the facts which they now allege, at any time prior to the entry of the final decree, which subjected all of the property in the receivers' hands to the payment of preferential demands, receivers' liabilities, and the mortgage indebtedness.   They might have brought the facts which they now allege to the attention of the court, namely, that the receivers had inadvertently assumed possession of property which was not covered by the mortgage, so far as general creditors were concerned; and they might have asked that such property be released from the custody of the receivers, or at least that the proceeds thereof, if sold, should not be applied to the satisfaction of preferential demands, receivers' liabilities, and the mortgage indebtedness, as was in fact done. If such intervening complaints had been filed at the proper time, it would have been possible to have instituted an inquiry concerning the alleged facts, and to have released any property which was not covered by the mortgage or was not rightfully in the custody of the receivers, if such a course had seemed necessary or proper for the protection of general creditors.   But no such action was taken by the interveners, nor is any sufficient reason disclosed why such action was not taken. The pendency of the foreclosure proceedings was well known, being a matter of public notoriety.   The claims of the interveners had accrued when the foreclosure suit was instituted, and some of them were of long standing.   Nevertheless, as before stated, the interventions were not filed until after the entry of a decree which, in effect, subjected all the property then in the receivers' hands to the payment of preferential debts, receivers' liabilities, and the mortgage indebtedness. Indeed, the interventions were not filed until after the property to be affected was sold under the decree, and the sale had been duly confirmed.   At that late day the interveners appeared, and prayed that their demands might be allowed and paid; basing their right to relief on the ground that the decree rendered was erroneous, in that it had subjected property of the mortgagor to the payment of preferential

demands, receivers' liabilities, and the mortgage indebtedness, which was not, in fact, covered by the lien of the mortgage, so far as the interveners were concerned. In view of these considerations, the court is of opinion that the interveners are precluded by laches, if for no other reason, from obtaining the relief sought, in so far as such relief is based on the allegation that certain property was appropriated by the receivers which was not covered by the mortgage. This was substantially the view taken by the Circuit Court of the United States for the Eastern District of Michigan in Farmers' Loan & Trust Co. v. Detroit, B. C. & A. R. Co., 71 Fed. 29, 35, 36, where an analogous question arose, and a general creditor of a mortgagor company was denied relief because he had failed to file his intervention in due season.

The case has been treated thus far upon the assumption that certain personal property, described as materials and supplies incident to the operation of a railroad, and located at Ft. Scott, Kan., has been subjected to the payment of the mortgage indebtedness, or has been consumed in a manner which was beneficial to the mortgage bondholders, to which the lien of the mortgage did not extend, so far as the interveners are concerned. But this assumption seems to be erroneous. The mortgage in controversy was filed and recorded as a real estate mortgage in Crawford county, Kan., where the personal property in dispute was located, but it was not filed, it seems, as a chattel mortgage in said county; nor was an annual affidavit afterwards made, showing the amount due and unpaid thereon, as the local law (sections 4244, 4246, Rev. St. Kan. 1901) requires. It is conceded that the mortgage in question sufficiently described the property in controversy, and intended to convey it as security for the mortgage debt; but it is contended that for want of an actual delivery of the property to the trustees in the mortgage, and because of the failure to comply with local laws concerning the registry of chattel mortgages, it was void as to creditors such as the interveners. The question has been mooted whether the law relating to the recording of chattel mortgages is applicable to railroad mortgages, such as cover an entire railroad and all personal property connected therewith and appurtenant thereto, and the authorities on that point have been collected by counsel with some care. Hammock v. Trust Co., 105 U. S. 77, 26 L. Ed. 1111; Southern California Motor Board Co. v. Union Loan & Trust Co., 12 C. C. A. 215, 64 Fed. 450; Farmers' Loan & Trust Co. v. Detroit, B. C. & A. R. Co. (C. C.) 71 Fed. 29. But it is deemed unnecessary on this occasion to express an opinion with relation to the point thus raised. Under the laws of Kansas an unrecorded chattel mortgage is only void as to creditors and subsequent purchasers and mortgagees in good faith. It is valid as between the mortgagor and mortgagee, and, if a delivery to the mortgagee takes place at any time before a levy or seizure is made in behalf of those persons as to whom it is void, the defect will be cured, and the mortgagee's lien will be protected, regardless of his failure to record the instrument or to make the annual affidavit. Dayton v. Bank, 23 Kan. 421, 423; Cameron v. Marvin, 26 Kan. 612; Dolan v. Van Demark, 35 Kan. 304; Leech v. Manufacturing Co. (Kan.) 56 Pac. 134. Now, it is undeniable that the receivers took possession of the personal property in controversy un-

der the order appointing them; that it was sold by the special master, or such part thereof as had not at the time been consumed, under the decree of foreclosure, as a part and parcel of the mortgaged estate; and that the purchaser assumed possession thereof, and had it in his possession for at least two months before these interventions were filed. Under these circumstances, the fact, if it be a fact, that the mortgage was not duly recorded, lends no support to the interveners' claims. The possession taken by the purchaser at the foreclosure sale (it having been sold as a part of the mortgaged property) is as effectual to cure any defect in the matter of recording the instrument as possession actually taken by the mortgagee or trustee in the mortgage. Lyle v. Palmer, 42 Mich. 314, 3 N. W. 921.

The right of the interveners to have their unliquidated demands for damages inflicted by the mortgagor company allowed and paid because the receivers took possession of some money in the treasury of the mortgagor company when they were appointed, and received the net income of its property until October 1, 1899, when the second default in the payment of interest accrued, and when the trustees in the mortgage, by virtue of its provisions, were entitled to take possession of the mortgaged property without the aid of legal process, rests upon no better ground and is supported by no higher equity than their right to relief predicated upon the ground which was last considered. The mortgage which is involved in the present case, in broad terms, pledged all "revenues, rates, tolls, incomes, rents, issues, profits, and sums of money arising from or to arise from" the operation of the mortgagor's railroad to the payment of its bonded indebtedness. The bill under which the receivers were appointed charged that there had been a default on the part of the mortgagor in the payment of an interest installment amounting to $575,000, which fell due April 1, 1899; that the mortgagor owed floating debts and accrued taxes to the amount of about $575,000, which it was unable to pay; that it owed nearly $2,000,000 on account of rolling stock, which sum it was required to pay at the rate of $40,000 per month; that a large sum of money would soon become due to its employés on account of wages; and that the mortgagor company was unable to meet these obligations, and was in fact insolvent. These allegations proved to be well founded. It is within the personal knowledge of this court that the funds which came to the possession of the receivers, and all the income which they derived from the operation of the road, up to October 1, 1899, were insufficient to pay off floating debts and meet current obligations and keep the railroad in operation, and that large sums of money were borrowed by the receivers, by direction of the court, to supply the deficiency, which loans were subsequently paid by or in behalf of the bondholders or other persons interested in the property. The fact is that the railroad, at the time the receivers were appointed, was in many respects incomplete and unfitted for operation. It was not in a condition, without further large expenditures of money and labor, to earn any net income. The funds to complete it and to make good any deficiency in operating expenses were raised, by means of receivers' certificates, on the credit of the property in their hands, and, by an order of this court, were made a special lien on the property, paramount

to the mortgage. Moreover, these interveners, while the foreclosure proceedings were pending, made no effort to impound the money that was in the treasury of the company when the receivers were appointed, or the net income, if there was any, which came to their hands prior to the second default, on October 1, 1899. In view of these facts, it seems to the court manifest that the claim of the interveners that the amount of funds in the treasury at the time the receivers were appointed, and the net income, prior to October 1, 1899, should be ascertained and paid to them, is without merit. Whatever the amount of such fund or income may have been, it was disbursed in the course of the receivership, in the discharge of liabilities of the mortgagor company, that were at least as meritorious as the claims of the interveners. In all probability, the fund which they seek to reach, and upon which they found their equity, was expended in the payment of liabilities of the mortgagor that were of a preferential nature, namely, for the wages of employés and for materials and supplies. But be this as it may, the court is of opinion that inasmuch as the mortgagor company was in an insolvent and failing condition when the receivers were appointed, and had defaulted in the payment of one of its interest installments, and was unable to discharge its duties to the public in consequence of its insolvent condition, it was entirely competent for the court, through the agency of its receivers, to take possession of the funds in question, and of the net income, and to make such application of the same as was in fact made, and that no equity arises in favor of the interveners in consequence of what was thus done. The fact that by the provisions of the mortgage the trustees therein were not entitled, of their own volition, to take possession of the mortgaged property until six months subsequent to a default, surely did not preclude a court of equity from entertaining a bill to foreclose, and appointing receivers thereunder, when it was found necessary to do so for the protection of the mortgaged property, and to insure the due performance of those obligations which the mortgagor owed to the public.

With respect to the second ground of relief which is relied upon in the several interventions (being the ground hertofore stated), it is to be observed that this court has heretofore decided that it would not entertain an intervening petition which was filed in this cause by an unsecured creditor of the Kansas City, Pittsburg & Gulf Railroad Company with a view of compelling the Kansas City Southern Railway Company, the purchaser at the foreclosure sale, to pay his demand upon the ground that no foreclosure of the mortgagor's interest in the mortgaged property had in fact been effected by the foreclosure suit, and that the legal proceedings taken in that behalf had merely operated as a reorganization of the mortgagor company; leaving the property to which the proceeding related in the purchaser's hands, subject to the payment of the mortgagor's debts. No sufficient reasons are disclosed for departing from that rule on the present occasion. The foreclosure suit was heard and determined in the usual way, and according to the established course of procedure in such cases. An upset price ($12,500,000) was fixed by the court, which, considering the then condition and value of the mortgaged property, was deemed ade-

quate to insure a fair sale, and protect the interests of all persons who had either a legal or an equitable claim on the property. The decree expressly provided that the sale, when made and confirmed, should operate as "a perpetual bar, both in law and equity, to the Kansas City, Pittsburg & Gulf Railroad Company, and the defendants in this suit, and each and every of them, and all persons claiming by, from, or under them, or any of them, in or to or in respect of said premises, property, or franchises so sold and conveyed, and each and every part thereof." The same decree, in effect, adjudged that the purchaser at the foreclosure suit should take the property purchased free from all demands against the mortgagor company, save an obligation to see that the costs of the suit and all of the receivers' liabilities and preferential demands were duly paid, if these were not discharged by the proceeds of the sale. The agreement that had been entered into between the bondholders and stockholders of the mortgagor company, to which allusion is made in the intervening petitions, was not exhibited to the court in the course of the foreclosure proceedings; nor did the court deem it any part of its duty to inquire into the arrangement that had been made by the purchasing company to obtain the means wherewith to make the purchase, or to inquire on whose account the purchase was made, or how the purchasing company had disposed of its stock, or concerning the amount of the bonds and stock which it proposed to issue, or to whom such bonds and stock had been issued. The mortgage that was foreclosed contained an express agreement, in the eighth article, that the trustees therein, or their successors, might "bid for and purchase [the mortgaged property] or cause the same to be bid for and purchased for and in behalf of the holders of the bonds hereby secured, * * * in proportion of the respective interests of said bondholders, at a reasonable price." The manner in which the purchasing company had been organized, and had disposed of its stock and bonds, seemed to be a matter which was foreign to any issue raised in the foreclosure suit, and of no concern to the court, provided the purchaser faithfully complied with the terms of the purchase, as it subsequently did. In view of these considerations, the court concludes that, even if it be true, as now claimed, that because the new or purchasing company issued its stock and bonds, in certain proportions, to the stockholders and bondholders of the old company, in pursuance of an agreement to that effect, which was made before the sale, and before the new company was organized, it thereby placed itself, notwithstanding the purchase, in a situation where it became legally or equitably chargeable with the debts of the old company, then and in that event the right or equity in question should be enforced by an original proceeding against the Kansas City Southern Railway Company, and such other parties as may be entitled to be heard with respect to such equity, rather than by an intervention in the foreclosure suit. In so far as the interveners ask for relief on the ground last mentioned, they manifestly seek to impeach the decree by depriving it of the effect of a decree of foreclosure, which it was intended to have, and by imputing to it an entirely different effect. They seek in this way to overthrow the decree, although they came into court subsequent to its rendition, and ostensibly, at least, for the purpose of

availing themselves of some of its provisions. This they should not be permitted to do, especially as they can readily enforce the rights which they now assert by an original bill, if such rights exist. As the interveners were not parties to the foreclosure suit, they are not bound by the decree therein, if that action was not brought in good faith to secure the foreclosure of a mortgage, but was brought, by collusion between the bondholders and stockholders of the old company, for the fraudulent purpose of enabling the stockholders to appropriate a part of the corporate assets, to the prejudice of the corporate creditors. If the decree is to be assailed on that ground—and such seems to be the second ground of assault—then it should be made by an original bill, inasmuch as the general rule is that one who is not a party to a suit, but who intervenes, comes in in subordination to the record as he finds it, and will not be permitted to raise new issues or delay final action in the case, or insist upon a change in the form of the proceedings. 11 Enc. Pl. & Prac. 509, 510, and cases there cited. If this is the rule as respects an ordinary intervention filed in advance of a final judgment or decree, much greater reason exists for requiring one to proceed by an original bill who comes forward after a final decree, and after third parties have acquired rights thereunder, and proposes to impeach it for reasons dehors the record.

Touching the final paragraph of the decree, on which counsel for the interveners seem to lay some stress, as containing a reservation of power in the court to modify or amend the decree at the instance of a party or an intervener, it is to be observed that this clause was inserted in the decree solely for the purpose of reserving the power to make such modifications in the conditions of the sale and as to the distribution of the proceeds as might be deemed necessary, intermediate the entry of the decree and the occurrence of the sale. It was not intended as a reservation of power to overturn the decree and rights acquired thereunder after the sale of the mortgaged property, and the delivery of the same to the purchaser, at the instance of any third party who might come forward and suggest that the decree was in some respects erroneous.

The result is that the exceptions to the master's report will be overruled, his report will be confirmed, and an order will be entered dismissing the several interventions.